U.S. DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA
FILED
NOV 3 0 2023
CLERK

## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

### INDICTMENT FOR CONSPIRACY TO COMMIT HEALTH CARE FRAUD, HEALTH CARE FRAUD, AND ENGAGING IN UNLAWFUL MONETARY TRANSACTIONS, AND NOTICE OF FORFEITURE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 23- 101-SDD-SDJ |
| | : | |
| | : | 18 U.S.C. § 1349 |
| | : | 18 U.S.C. § 1347 |
| versus | : | 18 U.S.C. § 1957 |
| | : | 18 U.S.C. § 2 |
| | : | 18 U.S.C. § 981 |
| | : | 18 U.S.C. § 982 |
| | : | 21 U.S.C. § 853(p) |
| BRAD PAUL SCHAEFFER | : | 28 U.S.C. § 2461 |

**THE GRAND JURY CHARGES:**

**AT ALL TIMES RELEVANT TO THIS INDICTMENT:**

### Health Care Benefit Programs

1. The Medicare Program ("Medicare") was a federal health insurance program, affecting commerce, that provided benefits to persons who were 65 years of age and older or disabled. Medicare was administered by the United States Department of Health and Human Services ("HHS") through its agency, the Centers for Medicare and Medicaid Services ("CMS").

2. The Medicaid Program ("Medicaid") was a federal and state funded health insurance program designed to provide medical assistance to persons whose income and resources were insufficient to meet the costs of necessary care and services. In Louisiana,

1

CMS contracted with the Louisiana Department of Health and Hospitals, located in East Baton Rouge Parish, Louisiana, to manage Medicaid, including the enrollment of medical service providers ("providers") and the processing of claims for services rendered to Medicaid recipients ("Louisiana Medicaid").

3.  Medicare and Medicaid were "health care benefit program[s]," as defined by Title 18, United States Code, Section 24(b), and "Federal health care program[s]," as defined by Title 42, United States Code, Section 1320a-7b(f).

4.  Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries." Individuals who qualified for Medicaid benefits were commonly referred to as "recipients" (hereafter, "beneficiaries" and "recipients" will be collectively referred to as "beneficiaries"). Each beneficiary was given a unique identification number.

5.  Health care benefit programs typically required providers to enroll in the programs in order to submit claims for items and services. Specifically, as part of the Medicare and Medicaid enrollment processes, providers, including laboratories, submitted enrollment applications.

6.  For instance, the Medicare provider enrollment application, CMS Form 855B, was required to be signed by an authorized representative of the provider. CMS Form 855B contained a certification that the provider would abide by the Medicare laws, regulations, and program instructions, including but not limited to the Federal Anti-Kickback Statute. In executing CMS Form 855B, providers further certified that they "w[ould] not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and w[ould] not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

7.  In the Louisiana Medicaid provider enrollment application, providers similarly certified that any false claims, statements, or documents, or concealment of a material fact could be prosecuted under applicable federal and state laws. Upon enrollment, providers were furnished instructions on how to access Louisiana's Medicaid's "Provider Manual," which contained the program's rules and regulations.

8.  If Medicare or Medicaid approved a provider's application, it would assign the provider a provider number. A provider with a provider number could submit claims to obtain reimbursement for medically necessary items and services.

9.  When seeking reimbursement from Medicare and Medicaid, providers submitted the cost of the service provided together with the appropriate "procedure code," as set forth in the Current Procedural Terminology ("CPT") Manual or the Healthcare Common Procedure Coding System.

10. Medicare and Medicaid only paid for items and services that were reasonable and medically necessary and were provided as represented. Medicare and Medicaid would not reimburse providers for claims that were procured through the payment of kickbacks and bribes.

**Urine Drug Testing**

11. In certain circumstances, Medicare and Medicaid covered, among other things, diagnostic testing, including urine drug testing.

12. Urine drug testing was a type of diagnostic testing used to determine whether a patient was taking drugs that might interfere with a planned medical treatment, or to ensure that a patient was compliant with a prescription regime. Urine drug testing included one or more levels of testing: presumptive tests (*i.e.*, drug screens) and definitive tests (*i.e.*,

confirmations). Presumptive tests were used to identify which substances, if any, were present in a urine specimen, and were therefore considered *qualitative*. Definitive tests were used to identify how much of a particular substance was present in a urine specimen and were therefore considered *quantitative*.

13. Definitive tests were typically administered after presumptive tests, with limited exceptions made for certain substances, such as certain synthetic opioids, that were not included in drug screens. Where a presumptive test produced an inconsistent or unexpected result for a particular substance, Medicare and Medicaid considered a definitive test to be medically necessary and appropriately reimbursable for that particular substance. Neither Medicare nor Medicaid would generally reimburse providers for confirming results of presumptive tests that were consistent or expected, or for standing and/or blanket orders of definitive tests.

14. Medicare and Medicaid rates of reimbursement for definitive testing generally increased based on the number of substances tested. Conversely, rates of reimbursement for presumptive testing did not vary based on the number of substances screened.

**The Defendant and Relevant Individuals and Entities**

15. MedComp Sciences, LLC ("MedComp") was a limited liability company with a principal place of business in Zachary, Louisiana. MedComp operated a clinical laboratory enrolled with Medicare and Louisiana Medicaid, among other Medicaid programs, that provided diagnostic testing services to beneficiaries, including urine drug testing services.

16. Defendant **BRAD PAUL SCHAEFFER** was a resident of Zachary, Louisiana. **SCHAEFFER** was the president and chief executive officer of MedComp, as well as a co-owner of MedComp. **SCHAEFFER** was a signatory on the Medcomp bank accounts.

4

**SCHAEFFER** also held a personal account with his wife at Bank 1 ending in x2608 (the "Schaeffer Account").

17. Laboratory 1 was a limited liability company with a principal place of business in Baton Rouge, Louisiana. Laboratory 1 operated a clinical laboratory enrolled with private insurance providers that purportedly provided diagnostic testing services to individuals, including urine drug testing services. Laboratory 1 was not enrolled with Medicare. Individual 1 was the President and Chief Executive Officer of Laboratory 1.

18. Laboratory 2 was a limited liability company with a principal place of business in Covington, Louisiana. Laboratory 2 operated a clinical laboratory enrolled with Medicare and Louisiana Medicaid that provided diagnostic testing services to beneficiaries, including urine drug testing services. From in or around January 2013 through 2016, Laboratory 2 served as a reference laboratory for MedComp. Individual 2 was the owner of Laboratory 2.

## COUNT 1
### Conspiracy to Commit Health Care Fraud
### (18 U.S.C. § 1349)

19. Paragraphs 1 through 18 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

20. Beginning in or around January 2013, and continuing through in or around August 2022, in the Middle District of Louisiana, and elsewhere, the defendant,

**BRAD PAUL SCHAEFFER,**

did knowingly and willfully conspire and agree with others known and unknown to the Grand Jury, to execute, and attempt to execute, a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b),

namely, Medicare and Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money owned by, and under the custody and control of, Medicare and Medicaid, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

## Purpose of the Conspiracy

21. It was a purpose of the conspiracy for **SCHAEFFER** and his co-conspirators to unlawfully enrich themselves by, among other things: (a) submitting and causing the submission of false and fraudulent claims to Medicare and Medicaid for definitive tests that were not medically necessary and not eligible for reimbursement, including for services purportedly rendered to beneficiaries located in the Middle District of Louisiana and elsewhere; (b) concealing the submission of false and fraudulent claims for definitive tests to Medicare and Medicaid; (c) receiving and obtaining the reimbursements paid by Medicare and Medicaid based on the false and fraudulent claims submitted; and (d) diverting proceeds of the fraud for the personal use and benefit of **SCHAEFFER** and his co-conspirators.

## Manner and Means of the Conspiracy

22. The manner and means by which **SCHAEFFER** and his co-conspirators sought to accomplish the objects and purpose of the scheme included, among others, the following:

    a. In 2012, MedComp, at **SCHAEFFER's** direction, enrolled in Medicare. In so doing, **SCHAEFFER**, through MedComp, received education on Medicare rules and regulations and federal laws, including Medicare's requirement of medical necessity, and prohibitions on fraud, waste, and abuse. MedComp, at **SCHAEFFER's** direction, signed corresponding enrollment documents and certifications with Medicaid programs, including Louisiana Medicaid, and was furnished instructions on how to access Louisiana Medicaid's

6

Provider Manual.

      b.     Further, beginning as early as February 2014, **SCHAEFFER** emailed copies of Medicare's rules governing reimbursement for definitive testing to colleagues. **SCHAEFFER** also circulated links to press releases concerning clinical laboratories under federal investigation for illegally submitting claims to Medicare for panels of definitive tests that were medically unnecessary.

      c.     Despite his knowledge of applicable rules and regulations, **SCHAEFFER**, through MedComp, knowingly and willfully executed a nearly ten-year scheme to submit hundreds of millions of dollars in false and fraudulent claims to Medicare and Medicaid, for panels of definitive tests that were medically unnecessary.

      d.     Specifically, **SCHAEFFER** directed sales representatives employed by MedComp to solicit doctors and other health care providers to sign up for MedComp's definitive testing services. Sales representatives, at **SCHAEFFER's** direction, were instructed to pressure providers into agreeing to perform definitive testing on all urine specimens for as many substances as possible, regardless of presumptive test results, while concealing from providers that such reflexive testing was unallowable under Medicare, Medicaid, and other health care benefit programs.

      e.     Once enrolled, Laboratory Support Assistants ("LSAs"), employed and trained by MedComp, and at **SCHAEFFER's** direction, ordered definitive tests on the providers' "behalf," using MedComp's check-the-box order forms, which contained preset panels chosen by MedComp, all of which commanded high reimbursement rates. The order forms often lacked physician signatures, and LSAs were typically instructed at **SCHAEFFER's** direction to choose one of MedComp's preset panels for every patient,

7

regardless of presumptive test results and a beneficiary's treatment plan. Once completed, the LSAs submitted the orders and accompanying urine specimens to: (1) MedComp or Laboratory 2 if the patient was a beneficiary; or (2) Laboratory 1 if the patient had private insurance.

  f. In order to conceal the fraud, patients and providers were instructed to direct all billing concerns and inquiries to MedComp. **SCHAEFFER** also directed MedComp employees to write off co-pays for definitive tests performed, so that Medicare and Medicaid, but not beneficiaries, paid for the unnecessary testing.

  g. In order to obtain referrals, **SCHAEFFER**, through MedComp, paid commissions to MedComp sales representatives in exchange for the urine specimens they referred for definitive testing. The commission payments were typically made on a per sample basis, based on the volume and value of the definitive testing orders referred.

  h. Further, from in or around 2013 through September 2017, **SCHAEFFER**, through MedComp, knowingly and willfully paid millions of dollars in kickback payments to certain high-referring doctors in exchange for referring specimens for definitive testing to MedComp and Laboratory 1.

  i. In order to conceal the payments to physicians, **SCHAEFFER** and Individual 1 disguised the kickback payments as "membership or ownership interests" in purported physician-owned laboratories. In reality, the "laboratories" were actually shell entities established to compensate physicians for referrals, with membership interests or "dividends" based on the volume and value of referrals to MedComp and Laboratory 1 for definitive testing.

  j. **SCHAEFFER** also took numerous steps to conceal and further the

8

scheme. For example, starting in or around 2014, after Laboratory 2 was suspended from Blue Cross Blue Shield of Louisiana's ("BCBSLA") private insurance network—due to, in part, the submission of inappropriate urine drug testing claims referred by MedComp to Laboratory 2—**SCHAEFFER** and Individual 2, instead of stopping the inappropriate claims, hid the unlawful billing by entering into so-called "pass-through-billing" arrangements with hospitals. In pass-through-billing arrangements, the hospitals would falsely bill BCBSLA for testing performed by MedComp or Laboratory 2, as if the hospitals had performed the tests themselves, and the entities would split the profits. **SCHAEFFER** and Individual 2 targeted hospitals for the scheme as they believed hospitals received less regulatory scrutiny for urine drug testing than independent laboratories.

k. Additionally, to further maximize reimbursement from the scheme, **SCHAEFFER**, through MedComp, knowingly and willfully submitted false and fraudulent claims to Medicare for definitive testing on samples MedComp failed to store at required temperatures, which had rendered them inappropriate for testing and subsequent reimbursement.

l. Further, starting in or around 2015, **SCHAEFFER**, through MedComp, received numerous education letters from Medicare and Medicaid, which contained specific guidance on medical necessity requirements for definitive urine drug testing, including prohibitions on reflexive testing and standing orders, and details on MedComp's own inappropriate claims. In response to the increased scrutiny, **SCHAEFFER** did not inform providers as to the true nature, permissibility, and extent of the definitive tests MedComp was running. Instead, **SCHAEFFER** renamed the definitive testing panels on MedComp's requisition forms from "A," "B," and "C," to "High," "Medium" and "Low" risk "profiles,"

9

respectively, to make the panels falsely appear "risk-based" and compliant, while, in reality, the panels were substantively unchanged. Further, in some instances, MedComp would submit claims to Medicare and Medicaid for definitive testing even when the provider only ordered a drug screen, while in others, LSAs would falsely and fraudulently sign requisition forms as the "provider," or MedComp would accept requisition forms unsigned, to conceal the misconduct.

    m.    **SCHAEFFER** continued to direct LSAs to order definitive testing for nearly all patients, using the same panels, regardless of the results of any presumptive testing performed, until in or around September 2022, when CMS notified **SCHAEFFER**, through MedComp, that MedComp was suspended from receiving Medicare payments.

### Scope of Scheme

23.    From in or around January 2013, and continuing through in or around August 2022, in the Middle District of Louisiana, and elsewhere, **SCHAEFFER** caused MedComp to submit over $148 million in false and fraudulent claims to Medicare and Medicaid for definitive urine drug testing that was ineligible for reimbursement because the testing was not medically necessary. Of these claims, Medicare and Medicaid reimbursed MedComp over $27 million.

All in violation of Title 18, United States Code, Section 1349.

### COUNTS 2 – 6
### Health Care Fraud
### (18 U.S.C. § 1347)

24.    Paragraphs 1 through 18 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

25. On or about the dates set forth below, with respect to each count, in the Middle District of Louisiana, and elsewhere, the defendant,

**BRAD PAUL SCHAEFFER,**

in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, and aided and abetted others in executing, a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), namely, Medicare and Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money owned by, and under the custody and control of, Medicare and Medicaid.

### Purpose of the Scheme

26. The purpose of the scheme is more fully described in paragraph 21 of this Indictment and is re-alleged and incorporated by reference as though fully set forth herein.

### Manner and Means

27. The manner and means of the scheme are more fully described in paragraph 22 of this Indictment and are re-alleged and incorporated by reference as though fully set forth herein.

### Acts in Execution of the Scheme

28. In order to execute and attempt to execute the scheme to defraud and to obtain money and property, and to accomplish the objects of the scheme, the defendant,

**BRAD PAUL SCHAEFFER,**

submitted, caused others to submit, and aided and abetted others in submitting, the following false and fraudulent claims, seeking the identified dollar amounts, and representing that such

benefits, items, and services were medically necessary and eligible for Medicare and Medicaid reimbursement, with each execution set forth below forming a separate count:

| Count | Beneficiary | Approx. Claim Date | Health Care Benefit Program | Description of Claim | Approx. Amount Billed |
|---|---|---|---|---|---|
| 2 | Beneficiary 1 | 01/31/2019 | Louisiana Medicaid | Definitive urine drug testing, 22+ substances | $893.04 |
| 3 | Beneficiary 2 | 07/29/2019 | Medicare | Definitive urine drug testing, 22+ substances | $740.76 |
| 4 | Beneficiary 3 | 07/29/2019 | Medicare | Definitive urine drug testing, 15-21 substances | $596.22 |
| 5 | Beneficiary 4 | 07/29/2019 | Medicare | Definitive urine drug testing, 15-21 substances | $596.22 |
| 6 | Beneficiary 5 | 08/07/2019 | Louisiana Medicaid | Definitive urine drug testing, 15-21 substances | $493.84 |

Each of the above is a violation of Title 18, United States Code, Sections 1347 and 2.

## COUNTS 7-9
### Engaging in Unlawful Monetary Transactions
### (18 U.S.C. § 1957)

29.    Paragraphs 1 through 18 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

30.    On or about the dates specified below as to each count, in the Middle District of Louisiana, and elsewhere, the defendant,

**BRAD PAUL SCHAEFFER,**

did knowingly engage and attempt to engage in a monetary transaction affecting interstate commerce by, through, and to a financial institution, affecting interstate and foreign commerce, involving criminally derived property of a value greater than $10,000, such

property having been derived from specified unlawful activity, knowing that the property involved in the monetary transaction was derived from some form of unlawful activity:

| Count | Approx. Date of Transaction | Description |
|---|---|---|
| 7 | 11/22/2019 | Check in the approximate amount of $26,050 from the Schaeffer Account to Fairbanks Homebuilders for **SCHAEFFER's** pool house. |
| 8 | 07/27/2021 | Check in the approximate amount of $75,000 from the Schaeffer Account to Tim Heroman for restoration of **SCHAEFFER's** Ford Bronco truck. |
| 9 | 08/10/2021 | Check in the approximate amount of $25,000 from the Schaeffer Account to Russell Pool Service for renovation of **SCHAEFFER's** swimming pool. |

It is further alleged that the specified unlawful activity is conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349, and health care fraud, in violation of Title 18, United States Code, Section 1347.

Each of the above is a violation of Title 18, United States Code, Sections 1957(a) and 2.

## NOTICE OF FORFEITURE

31.  Paragraphs 1 through 30 of this Indictment are incorporated herein by reference as factual allegations.

32.  Upon conviction of the offenses alleged in Counts 1 through 6 of this Indictment, the defendant, **BRAD PAUL SCHAEFFER**, shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, which constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of said offenses.

33. Upon conviction of the offenses alleged in Counts 7 through 9 of this Indictment, the defendant, **BRAD PAUL SCHAEFFER**, shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such offenses, or any property traceable to such property.

34. If any of the above-described property, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;
   b. has been transferred or sold to, or deposited with, a third party;
   c. has been placed beyond the jurisdiction of the Court;
   d. has been substantially diminished in value; or
   e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States to seek a forfeiture money judgment and, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

UNITED STATES OF AMERICA, by

_____
RONALD C. GATHE, JR.
UNITED STATES ATTORNEY

_____
ELIZABETH E. WHITE
ASSISTANT UNITED STATES ATTORNEY

A TRUE BILL

**REDACTED
PER PRIVACY ACT**
GRAND JURY FOREPERSON

_Nov. 30, 2023_
DATE

GLENN S. LEON
CHIEF
CRIMINAL DIVISION, FRAUD SECTION
UNITED STATES DEPARTMENT OF JUSTICE

_____
KELLY Z. WALTERS
SAMANTHA E. USHER
TRIAL ATTORNEYS
CRIMINAL DIVISION, FRAUD SECTION
UNITED STATES DEPARTMENT OF JUSTICE